No. 55,833

STATE OF KANSAS, *Petitioner*, v. THOMAS J. CAENEN, *Respondent.*

(681 P.2d 639)

Opinion filed April 27, 1984.

*Roger N. Walter,* disciplinary counsel, argued the cause and was on the brief for petitioner.

*Larry E. Benson,* of Weeks, Thomas & Lysaught, Chartered, of Overland Park, argued the cause and was on the brief for respondent.

*Per Curiam:* This is an original proceeding in discipline filed by the Board for Discipline of Attorneys (the Board) by Arno Windscheffel, Disciplinary Administrator, pursuant to Supreme Court Rule 212 (232 Kan. clxvii). A panel of the Board, after a hearing, determined that respondent neglected a legal matter entrusted to him and had violated DR 2-103 (A) and (B) (232 Kan. clxxix) and DR 9-102 (B) (232 Kan. cxcii), and had failed to cooperate with the Disciplinary Administrator in violation of Rule 207 (232 Kan. clxiv), and recommended the respondent be indefinitely suspended from the practice of law. Respondent filed exceptions to the report of the disciplinary panel (panel).

In November, 1981, the respondent, Thomas J. Caenen, had a collection agency. Caenen employed an individual by the name of Evans. Evans was hired to visit the officers of certain professions and solicit their delinquent accounts for the respondent to attempt collection. Caenen paid Mr. Evans $100.00 per week plus a 20% commission on the gross amount of receipts generated on new collection accounts above his $100.00 a week draw.

About November 11, 1981, Evans and Lisa Smith, nonlawyer employees of Caenen, contacted the office of Eugene McGill, D.D.S., a dentist practicing in the Kansas City area. Neither McGill nor any member of his staff had had prior contact with the respondent or anyone affiliated with him.

Either Smith or Evans, or both, represented themselves to be "account service representatives" for Caenen. They presented the respondent's business card with their own names and the title "Account Service Repr." handwritten on the card. They spoke with Dr. McGill's office manager in an attempt to secure the referral of collection accounts to Caenen's office. Smith and Evans represented that the respondent's fee for the services contemplated would be 40% of any amount collected within one year and 50% of any amount collected after one year. These terms were written on the back of the business card provided Dr. McGill's office.

Dr. McGill's office manager agreed to refer one account to respondent for collection. The account was that of Terry Eason who owed an outstanding balance of $228.00 to Dr. McGill. By a letter dated November 16, 1981, Caenen acknowledged his employment and confirmed the terms as previously represented.

On December 2, 1981, Dr. McGill's receptionist phoned Evans at respondent's office to inquire as to the status of the collection account. Evans informed the receptionist that Eason had promised to be in that Friday with a $50.00 check. On January 5, 1982, the receptionist again contacted Mr. Evans. Mr. Evans informed her that a $50.00 payment had been received.

The only record apparently kept by respondent, and the only record produced by the respondent at the evidentiary hearing on this complaint, was a balance sheet reflecting Mr. Eason's name and the amount of the outstanding balance ($228.00) referred for collection. That sheet contains a handwritten note "12-5 Pd.

50.00." Caenen admitted on cross-examination that the records he maintained reflected that there was a payment of $50.00, and that he acknowledged to Dr. McGill or his office staff that he had a record of payment.

No money was forthcoming from the respondent. Thereafter Dr. McGill's office repeatedly contacted the respondent's office by phone making inquiry as to the funds collected. On a number of occasions Caenen could not be reached. Messages were left but Caenen did not return the calls. Dr. McGill's office manager spoke to Caenen personally on March 9, 1982, and March 23, 1982. On both occasions he assured her that the amount due would be mailed immediately. The funds were not remitted.

On April 23, 1982, Dr. McGill spoke personally with Caenen by phone. During this conversation, Caenen told McGill his records regarding Mr. Eason's account indicated that he had received one payment of $50.00. Caenen acknowledged that the payment was overdue and said he would remit the amount immediately.

The payment was not remitted as respondent promised. Consequently, Dr. McGill complained to the office of the Disciplinary Administrator by letter dated May 7, 1982.

On May 11, 1982, the Disciplinary Administrator, Arno Windscheffel, sent a letter to Caenen enclosing a copy of the letter of complaint and requesting respondent's explanation. The letter was addressed to 10938 W. 64th Terrace, Shawnee Mission, Kansas. Receiving no reply to his first letter, Mr. Windscheffel sent a second letter dated July 20, 1982, again requesting Caenen's explanation regarding the complaint. This letter was mailed to the same address as the first letter.

Caenen testified that at the time this complaint was initiated, his office was located at 10938 W. 74th Terrace, Shawnee Mission, Kansas. Sometime in May of 1982, he moved his office location to 10281 Santa Fe Drive, Overland Park, Kansas. Caenen stated that he notified the Clerk of the Appellate Courts and the postal service of his change of address.

It appears the letters sent by the Disciplinary Administrator were improperly addressed. Notwithstanding, Caenen testified that he received the first letter dated May 11, 1982, sometime in July of 1982. Thereafter Caenen notified the Disciplinary Administrator's office of his new address. The second letter dated

July 20, 1982, was returned to the office of the Disciplinary Administrator by the postal authorities.

On August 2, 1982, Mr. Windscheffel sent respondent a third letter, enclosed a copy of Dr. McGill's complaint, and requested respondent's reply. This letter was properly addressed to his new address. Caenen did not reply to the letter. On August 31, 1982, Mr. Windscheffel sent Caenen a fourth letter, referencing his third letter of August 2, 1982, and again requesting some acknowledgement. Respondent did not reply.

Caenen communicated with Dr. McGill after the complaint was filed. On August 5, 1982, Dr. McGill received a phone call from a person representing herself to be Caenen's office manager. McGill explained the situation and the person calling promised payment would be forthcoming in the mail. Payment was not received. On August 25, 1982, Dr. McGill spoke personally with Caenen by phone. During the conversation, respondent implied that his records were not in order and that he would get back to McGill the next day. Caenen did not call Dr. McGill as promised. On September 1, 1982, Dr. McGill again spoke to Caenen. Caenen again attempted to put Dr. McGill off saying his records were not in order. An argument ensued when Caenen implied that the $50.00 payment must have been paid directly to Dr. McGill's office, therefore Dr. McGill owed Caenen $20.00. McGill had no further contact with Caenen.

Mr. Windscheffel testified that Caenen never answered or in any manner responded to the allegations in Dr. McGill's letter of complaint. Consequently, on January 26, 1983, the complaint was referred for consideration to a review committee pursuant to Supreme Court Rule 210(c) (232 Kan. clxvi). Caenen failed to reply to the committee. The committee referred the complaint for formal prosecution. The formal complaint against the respondent was filed on February 14, 1983.

On February 23, 1983, Dr. McGill was contacted by Stephen McAllister, an employee of Caenen. McAllister asked McGill if there was anything that could be done to get the complaint dropped. McGill replied all that he ever wanted from the beginning was payment of the amount owed, which Caenen had acknowledged receiving. The following afternoon a money order was left at McGill's office in the amount of $30.00, fourteen months after the money had been received by Caenen.

Due to the fact that the respondent has practiced law for a number of years and the number and nature of the violations, the panel recommended that the respondent be suspended from the practice of law by the Supreme Court of the State of Kansas.

In *State v. Pringle*, 233 Kan. 726, 732, 667 P.2d 283 (1983), the court reviewed what weight should be accorded the findings of a hearing panel in a disciplinary proceeding:

"The findings of a panel should be accorded some weight, although the panel's report is advisory and not binding on the court. *State v. Freeman*, 229 Kan. 639, 644, 629 P.2d 716 (1981). In *State v. Zeigler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), 93 A.L.R.3d 869, the court stated:

" 'The State Board of Law Examiners [now Kansas Board for Discipline of Attorneys] was created by rule of this court (K.S.A. 1974 Supp. 7-124, No. 202 [a]), as an adjunct of the court to have general supervision over the discipline of attorneys. The role of the Board is similar to that of a commissioner appointed by this court to conduct hearings and to make a report of his findings, conclusions, and recommendations. Although such a report is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony. (See 7 C.J.S. Attorney & Client § 37, p. 805.)' "

The respondent challenges the panel's determination that he violated Disciplinary Rule 9-102 (B) (1), (3) and (4) (232 Kan. cxcii), which provides:

"(B) A lawyer shall:

"(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

. . . .

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Caenen argues the person responsible for his collections, Mr. Evans, did not keep accurate records, and that the respondent had trouble substantiating that a $50.00 payment was made by Eason to the respondent's office. In *State v. Barrett*, 207 Kan. 178, 184, 483 P.2d 1106 (1971), the court stated:

"It is intimated by respondent that some of the shortcomings set forth in the record may have occurred by reason of the action of his secretaries and other lay persons in the office.

"A lawyer often delegates tasks to clerks, secretaries and other lay persons in

his office. Such delegation is proper if the lawyer maintains a direct relationship with his client, supervises the delegated work, and has complete professional responsibility for the work product. [Citation omitted.]

"The work done by secretaries and other lay persons is done as agents of the lawyer employing them. The lawyer must supervise their work and be responsible for their work product or the lack of it. [Citation omitted.]"

See 7A C.J.S., Attorney & Client § 148, p. 203.

Evans' records showed a $50.00 payment had been made by Eason. Caenen admitted his office records indicated the payment was received. Respondent must take responsibility for Evans' records. The hearing panel's conclusion that DR 9-102 (B) (1), (3) and (4) were violated is supported by the evidence.

The respondent contends he did not violate DR 2-103 (A) and (C) (232 Kan. clxxix), which provide:

"(A) A lawyer shall not, except as authorized in DR 2-101 (B) recommend employment as a private practitioner, of himself, his partner, or associate to a layperson who has not sought his advice regarding employment of a lawyer. . . . .

"(C) A lawyer shall not request a person or organization to recommend or promote the use of his services or those of his partner or associate, or any other lawyer affiliated with him or his firm, as a private practitioner, except as authorized in DR 2-101, and except that:

"(1) He may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association and may pay its fees incident thereto.

"(2) He may cooperate with the legal service activities of any of the offices or organizations enumerated in DR 1-103 (D) (1) through (4) and may perform legal services for those to whom he was recommended by it to do such work if:

"(a) The person to whom the recommendation is made is a member or beneficiary of such office or organization; and

"(b) The lawyer remains free to exercise his independent professional judgment on behalf of his client."

In *State v. Moses*, 231 Kan. 243, 245-46, 642 P.2d 1004 (1982), a case which involved a direct mailing by an attorney to individuals who were selling their homes, the court stated:

"We fully recognize that the First Amendment rights of an attorney may be violated if a too restrictive approach is taken toward an attorney's right to advertise. *Bates v. State Bar of Arizona*, 433 U.S. 350, 53 L.Ed.2d 810, 97 S.Ct. 2691 (1977). The most recent pronouncement on the question by the United States Supreme Court is found in *In re R.M.J.*, 455 U.S. 191, 71 L.Ed.2d 64, 102 S.Ct. 929 (1982). In that case the Supreme Court held that certain restrictions on advertising and direct mailing in the rules of the Missouri Supreme Court violated the attorney's First Amendment rights and reversed a decision of the Missouri court that the respondent should be disciplined by private reprimand. While it is true that personal solicitation by an attorney is a form of advertising,

we do not believe all such solicitation is protected from reasonable regulation by the First Amendment to the United States Constitution. The United States Supreme Court has recognized a distinction between protected forms of advertising and direct solicitation. In *In re R.M.J.* the court noted:

" '*In Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 462 (1978), the Court held that the possibility of "fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct was so likely in the context of in-person solicitation, that such solicitation could be prohibited." ' 455 U.S. at 202.

"Recent cases involving direct mailings include *Bishop v. Committee on Professional Ethics*, 521 F. Supp. 1219 (S.D. Iowa 1981); *Koffler v. Joint Bar Ass'n*, 51 N.Y.2d 140, 432 N.Y.S.2d 872, 412 N.E.2d 927 (1980), *cert. denied* 450 U.S. 1026 (1981); *Greene v. Grievance Committee*, 54 N.Y.2d 118, 444 N.Y.S.2d 883, 429 N.E.2d 390 (1981); and *The Florida Bar v. Schreiber*, 407 So.2d 595 (Fla. 1981).

"It is argued that direct solicitation is nothing more than other forms of advertising protected by the First Amendment. The distinction between advertising, which may not be prohibited, and direct solicitation, which may, is a fine one but we are convinced such a distinction is justified. Traditionally, the prohibition against direct solicitation has been directed to the evils inherent in 'ambulance chasing' and the detriment members of the public may suffer by such solicitation.

"The solicitation in the instant case, while not being of the nature of ambulance chasing and hospital room solicitation, nevertheless is directed to a segment of the public which, under present economic conditions, is extremely vulnerable to a suggestion of employment that may or may not be advantageous to the individual homeowner. We are of the opinion that the concept of the regulation and restriction of personal solicitation is one which is not only viable but works to the benefit of the general public and to the fair administration of justice. Our Code of Professional Responsibility is patterned after that of the American Bar Association and DR 2-103 is comparable to the A.B.A. Code. We believe the prohibitions and restrictions set forth in the Code of Professional Responsibility in DR 2-103 are reasonable and necessary for the protection of the public and the fair administration of justice and as applied in this case are not invalid under the provisions of the First Amendment to the United States Constitution.

"We hold that direct solicitation of a stranger by an attorney for employment for a particular legal matter violates the provisions of the Code of Professional Responsibility, DR 2-103, and is subject to discipline as provided by the rules of this court."

The opinion in *State v. Moses*, 231 Kan. 243, was filed April 3, 1982, after the activities involved in this case occurred. The direct solicitation by Caenen or his agents of Dr. McGill is proscribed by *Moses* and DR 2-103. See Annot., Modern Status of Law Regarding Solicitation of Business by or for Attorney, 5 A.L.R. 4th 866.

The argument that the law on the question of restricting

advertising by attorneys was in a state of flux was put forward by the respondent in *State v. Moses*. That argument did not sway the court from publicly censuring Moses for his actions. DR 2-103 provided adequate notice to respondent that his actions were improper.

The direct solicitation of a stranger by an attorney or his agent for employment for a particular legal matter violates the Code of Professional Responsibility, DR 2-103, and is subject to discipline as provided by the rules of this court.

The respondent argues he was deprived of due process because he was not properly notified solicitation was to be a charge against him.

Supreme Court Rule 211(b) (232 Kan. clxvi), requires the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the alleged misconduct.

The seminal decision regarding the applicability of the due process clause to lawyer disciplinary proceedings is found in *In re Ruffalo*, 390 U.S. 544, 20 L.Ed.2d 117, 88 S.Ct. 1222, *reh. denied* 391 U.S. 961 (1968). There the United States Supreme Court held that a lawyer charged with misconduct in lawyer disciplinary proceedings is entitled to procedural due process, and that due process includes fair notice of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense.

Decisions subsequent to *Ruffalo* have refined the concept of due process as it applies to lawyer disciplinary hearings, and suggest that the notice to be provided be more in the nature of that provided in civil cases. The weight of authority appears to be that, unlike due process provided in criminal actions, there are no stringent or technical requirements in setting forth allegations or descriptions of alleged offenses. *Bar Ass'n v. Cockrell*, 270 Md. 686, 313 A.2d 816 (1974). Due process requires only that the charges must be sufficiently clear and specific to inform the attorney of the misconduct charged, but the State is not required to plead specific rules, since it is the factual allegations against which the attorney must defend. *Attorney Griev. Comm'n v. McBurney*, 282 Md. 116, 123-24, 383 A.2d 58 (1978). However, if specific rules are pled, the State is thereafter limited to such specific offenses. *McBurney*, 282 Md. at 124.

Subsequent to the *Ruffalo* decision, the due process requirements in lawyer disciplinary proceedings have been given exhaustive treatment by this court. In *State v. Turner*, 217 Kan. 574, 538 P.2d 966 (1975), 87 A.L.R.3d 337, the court summarized prior Kansas and federal precedent on the question, including *Ruffalo*, and held in accordance with established precedent that the State need not set forth in its complaint the specific disciplinary rules allegedly violated (*State v. Nelson*, 206 Kan. 154, 476 P.2d 240 [1970]), nor is it required to plead specific allegations of misconduct (*State v. Alvey*, 215 Kan. 460, 524 P.2d 747 [1974]). What is required was simply stated therein:

" 'We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. . . .

. . . .

" 'It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result.' " *State v. Turner*, 217 Kan. at 579-80.

The court has affirmed this holding in numerous subsequent cases: *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980); *State v. Regier*, 228 Kan. 746, 621 P.2d 431 (1980); *State v. Callahan*, 232 Kan. 136, 652 P.2d 708 (1982).

The due process requirements as set out in *Ruffalo* and the Kansas cases cited, and the requirements of Kansas Supreme Court Rule 211 (b), have been met.

The respondent challenges the panel's findings that he violated Supreme Court Rule 207 (a) (232 Kan. clxiv), which provides:

"(a) It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he may have affecting such matters."

Failure to cooperate with the Disciplinary Administrator pursuant to Rule 207 (a) can be cause for discipline. See *State v. Savaiano*, 234 Kan. 268, 670 P.2d 1359 (1983), for a more in depth discussion of failure to cooperate by an attorney.

The respondent admitted receiving three of the four letters sent by the Disciplinary Administrator. He never sent his explanation of the matter which was requested by the Disciplinary Administrator. The evidence supports the panel's finding of noncooperation in violation of Rule 207 (a).

The respondent contends the recommended punishment of suspension is too harsh. In *State v. Scott,* 230 Kan. 564, 571-72, 639 P.2d 1131 (1982), the court reviewed past disciplinary cases:

"In reviewing our previous cases we note the following actions have justified indefinite suspension: Conviction of a felony (*In re Evans,* 229 Kan. 182, 621 P.2d 991 [1981]); failure to carry out appeal services for which the attorney is hired, plus failure to maintain a separate trust fund for client's funds (*State v. Regier,* 228 Kan. 746, 621 P.2d 431 [1980]); failure to comply with a court order requiring funds wrongfully withdrawn from an estate to be returned (*State v. Goode,* 228 Kan. 3, 612 P.2d 149 [1980]); accepting double fees for the same service, one fee from the city and, without knowledge of the city, one fee from the special bond counsel (*State v. Romine,* 227 Kan. 745, 609 P.2d 681 [1980]); failure to represent a client in a civil action by filing proper pleadings thereby allowing a default judgment to be taken against the client (*State v. McGrew,* 227 Kan. 741, 609 P.2d 680 [1980]); dishonesty, fraud, deceit or misrepresentation involving misuse of client's funds (*State v. Freeman,* 229 Kan. 639).

. . . .

"In the following cases this court has determined that public censure was a proper discipline: Where the attorney was dilatory in representing a client but not guilty of any dishonesty, fraud or deceit (*State v. Granger,* 228 Kan. 401, 613 P.2d 954 [1980]); neglecting legal business, failing to withdraw from case, and failing to refund a fee as promised (*State v. Russell,* 227 Kan. 897); withholding a client's funds for an extended period of time (*In re Hanna,* 197 Kan. 645, 418 P.2d 140 [1966]); failure on demand to pay money to a client, but without intent to convert the funds (*In re McAnarney,* 197 Kan. 643, 418 P.2d 137 [1966]).

"Among the matters to be considered in determining the nature and extent of punishment or discipline for a breach of professional responsibility, this court may consider in mitigation the following: (1) Whether restitution has been made; (2) previous violations or the absence thereof; (3) previous good character and reputation in the community; (4) the present or past attitude of the attorney as shown by his cooperation during the hearing and acknowledgement of the transgression; (5) letters from clients, friends and lawyers in support of the character and general reputation of the attorney; and (6) any statement by the complainant expressing satisfaction with any restitution made and requesting no discipline. 7 Am. Jur. 2d, Attorneys at Law § 52, p. 112; *State v. Stakes,* 227 Kan. 711, 608 P.2d 997 (1980) (aggravating or mitigating circumstances); *State v. Leon,* 229 Kan. 178, 621 P.2d 1016 (1981) (previous record of professional conduct); *In re Ratner,* 194 Kan. 362, 399 P.2d 865 (1965) (testimony as to attorney's reputation and character)."

Misconduct by the respondent has been clearly and convincingly established. We have given careful consideration as to the nature and extent of the punishment or discipline that should be imposed upon the respondent for his breach of professional responsibility. Due to the numerous violations of professional conduct in this matter and previous violations of professional

conduct, we accept the recommendation of the Disciplinary Panel.

IT IS THEREFORE ORDERED AND ADJUDGED that Thomas J. Caenen be and he is hereby indefinitely suspended from the practice of law in the State of Kansas. The costs herein are assessed to the respondent.

IT IS FURTHER ORDERED AND ADJUDGED that respondent shall forthwith comply with Supreme Court Rule 218 (232 Kan. clxx).

This suspension becomes effective when this opinion is filed with the Clerk of the Supreme Court.